IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

KEITH CRONIN                                                                                          PLAINTIFF

v.                              NO. 3:15-cv-00305 PSH

CAROLYN W. COLVIN, Acting Commissioner                                          DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Keith Cronin ("Cronin") commenced the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Cronin maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers several reasons why, one of which has merit.[1] Cronin maintains that his residual functional capacity was not properly assessed because it does not account for the impact of his mental impairments.[2] The Court agrees.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. See Boettcher v. Astrue, 652 F.3d 860 (8th Cir. 2011).

[2] Specifically, Cronin alleges the following: "The ALJ found that Cronin's mental impairments only limit him to unskilled, entry-level work. Since Cronin does not have a high-school education and no past relevant work, he would be limited to unskilled, entry-level jobs even if he did not suffer from mental illness. Thus, the ALJ's [residual functional capacity] assessment actually incorporates little, if any, work-related limitations attributable to Cronin's mental impairments." See Document 11 at CM/ECF 13.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010).

The evidence of Cronin's mental impairments includes a mental evaluation performed by Dr. Dennis Vowell, Psy.D., ("Vowell") in October of 2011. See Transcript at 277-281.[3] Cronin reported problems with, inter alia, anger and anxiety. He reported no history of psychiatric treatment, although he did report being hospitalized once for "self harm behavior." See Transcript at 277. He reported difficulty maintaining employment, noting that he does not like being told what to do. Vowell diagnosed Cronin with a mood disorder, not otherwise specified. With respect to the effects of Cronin's mental impairments on his adaptive functioning, Vowell found the following:

> A. How do mental impairments interfere with this person's day to day [a]daptive functioning? ...
> [Cronin] does not drive but has [a] valid license stating "I just don't like

---

[3]

The ALJ found, and the Court adopts, the following with respect to the evidence prior to October 12, 2012:

> The record indicates that this is a Title XVI claim only. Therefore, the analysis of the evidence will focus primarily on the period at issue beginning October 12, 2012, the date of [Cronin's] current Title XVI application. Discussion of evidence prior to the period at issue is limited to placing [his] current symptoms and limitations in context or used solely to determine credibility issues. Thus, evidence prior to the period at issue was not considered when formulating [his] current limitations herein.

See Transcript at 16-17.

>   dealing with people [on] the roads." He occasionally goes shopping alone. He is capable of managing his own finances. He is able to complete basic household chores and [activities of daily living].
>
>   B. Capacity to communicate and interact in a socially adequate manner? …
>
>   [Cronin] appeared capable of adequate and socially appropriate communication and interaction in today's session.
>
>   C. Capacity to cope with the typical mental/cognitive demands of basic work-like tasks?
>
>   [Cronin] appeared to sustain a reasonable degree of cognitive efficiency and was able to track and respond to various kinds of questions and tasks without remarkable slowing or distractibility.
>
>   [D]. Ability to attend and sustain concentration on basic tasks?
>
>   As noted in the findings of the mental status exam, [Cronin] generally displayed mild to moderate impairments in his ability to respond adequately to basic assessment of attention and concentration capacity.
>
>   [E]. Capacity to sustain persistence in completing tasks?
>
>   Persistence appeared adequate throughout the session.
>
>   [F]. Capacity to complete work-like tasks within an acceptable time frame?
>
>   [Cronin] did not display remarkable psychomotor slowing. In terms of mental status type tasks, capacity to perform within a basically acceptable time frame was demonstrated.

See Transcript at 280-281. Vowell offered an opinion regarding Cronin's ability to function in a workplace setting. It was Vowell's opinion that Cronin could function in such a setting as follows:

> Basic mental status exam and intellectual assessment indicates [Cronin] possesses mild to moderate impairments in understanding, carrying out, or remembering instructions. At times he would likely respond to supervision, co-workers, and work pressure approximately. However, his capacity to cope adequately could be significantly hindered in times of mild to moderate stress.

See Transcript at 281.

In November of 2011, Cronin was seen by Dr. Roger Troxel, M.D., ("Troxel") for a general physical examination. See Transcript at 301-306. Cronin reported problems with anger and anxiety. Troxel diagnosed Cronin with mild anxiety but found that he had no physical limitations.

In October of 2012, Cronin presented to a medical clinic complaining of anxiety and depression. See Transcript at 308-310. He identified his nearly constant symptoms as chest pain, insomnia, light-headedness, paresthesias, increased perspiration, shortness of breath, and tachycardia. He attributed his anxiety to "occupational stressors; crowds or public places; and small, closed-in spaces." See Transcript at 308. He attributed his depression to marital issues and unemployment. Dr. Thomas Baldwin, M.D., ("Baldwin") examined Cronin and observed, inter alia, that he was having fleeting thoughts of suicide and violent behavior and was hearing voices. Baldwin diagnosed Cronin with a bipolar disorder, its current episode being of a moderate, manic nature; and chronic schizophrenia. Baldwin prescribed lithium carbonate and scheduled Cronin for a follow-up appointment two weeks later. It appears that Cronin never presented for the follow-up appointment.

In May of 2013, Cronin presented to Families, Inc., for mental health treatment. See Transcript at 320-328. He reported problems with depression and anxiety. A mental status examination revealed, inter alia, his activity level and affect were appropriate; his mood was depressed/dysthymic, anxious; he was fully oriented; and he had a normal flow of thought. He was diagnosed with several mental impairments, prescribed medication, and enrolled in individual therapy.

Cronin was seen at Families, Inc., for what appears to have been six individual therapy sessions. See Transcript at 329-330 (05/29/2013), 331-332 (06/03/2013), 333-334 (06/10/2013), 335-336 (06/14/2013), 337-338 (06/19/2013), 339-340 (06/21/2013). The progress notes reflect that his condition remained largely unchanged.

In July of 2013, Cronin was seen by Dr. Vickie Caspall, Ph.D., ("Caspall") for a mental evaluation and intellectual assessment. See Transcript at 342-350. Cronin reported problems with anger and anxiety. He reported that he cannot be around people long enough to keep a job and noted that his last job ended after about five hours when he "slammed his boss' face into a truck." See Transcript at 344. Caspall administered Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV") testing, and Cronin's scores included the following: a full scale IQ score of sixty-one, a verbal comprehension index score of sixty-six, a perceptual reasoning index score of sixty-seven, a working memory score of sixty-five, and a processing speed score of sixty-eight. Although Caspall considered the results valid and reliable, she opined that the scores were inconsistent with a diagnosis of mental retardation. Specifically, she observed the following:

> … While scores on the WAIS-IV were below 70, in my opinion, the sub average score is not consistent with a diagnosis of mental retardation. There are numerous factors affecting [Cronin's] overall performance. These include lack of education, motor slowing and difficulty with convergent thinking where answers must follow specific rules. According to [Cronin], he was absent from school frequently from the 7th grade through the 11th due to hospitalizations, incarceration through juvenile services, moving to different foster homes, and alleged injuries due to physical abuse. Additionally, [he] reports that he is capable of performing activities of daily living but is limited due to anxiety and mania.

See Transcript at 347-348. Caspall also opined that Cronin's deficits in adaptive functioning were inconsistent with a diagnosis of mental retardation. With respect to the effects of Cronin's mental impairments on his adaptive functioning, Caspall found the following:

> A. How do mental impairments interfere with this person's day to day adaptive functioning? …
>
> [Cronin] reports that he does sometimes drive but prefers not to as he gets very anxious. According to [Cronin], his psychiatrist has told him that he needs to get out in public a few times per week for 10 minutes as he is becoming isolated and fearful of public places. [Cronin] reports that if he turns up the music in his car loud he is able to block out noises and can drive for short distances. [He] reports that he relies on his wife and friends to do his shopping. According to [Cronin], he rides with her the days he is supposed to go out in public but as soon as his 10 minutes are up he hurries back to the car. [Cronin] reports that he has the capacity to handle personal finances in terms of balancing checks and bill paying. He further reports that he has never gone on spending sprees or spent money needlessly while in a manic state.
>
> [Cronin] reports that he is Catholic but has no friends through the church. He doesn't go to church but reads his bible at home. He prefers to be alone and doesn't go out unless ordered to do so by his doctor.

> B. Capacity to communicate and interact in a socially adequate manner?
>
> It is my clinical impression that [Cronin] is guarded and paranoid. He was extremely anxious when he entered the exam room and his legs wouldn't stop shaking. He apologized and reported that he gets nervous when he is in confined spaces with his back to a door. [He] reports having problems making friends due to paranoia and anger control. It is my clinical opinion that [he] is anxious and moderately depressed resulting in level of current functioning deteriorating into deeper depression and isolation.
>
> C. Capacity to cope with the typical mental/cognitive demands of basic work-like tasks?
>
> [Cronin] is guarded and defensive. However, [he] appeared to sustain a reasonable degree of cognitive efficiency and was able to track and respond to various kinds of questions and tasks without remarkable slowing or distractibility. However, he needed reassurance during the exam to calm him. It is difficult to say how this would play out during the course of a day.
>
> D. Ability to attend and sustain concentration on basic tasks?
>
> [Cronin] generally responded adequately to basic assessment of attention. Concentration was not greatly impaired. While performance was significantly below average on the various tests, the poor performance was not due to lack of persistence and inattention.
>
> E. Capacity to sustain persistence in completing tasks?
>
> No signs of difficulty with persistence in completing tasks during this examination were observed. He did display some loss of basic persistence toward the end of the exam. But loss of persistence appeared to be due to fatigue.
>
> F. Capacity to complete work-like tasks within an acceptable timeframe?
>
> [Cronin] displayed psychomotor slowing and slow cognitive processing. In terms of subtests, his capacity to perform within a basically acceptable time frame was not significantly limited.

See Transcript at 348-349. Caspall diagnosed Cronin with a bipolar disorder, most recent

episode manic, mild; and schizophrenia, undifferentiated type by history.

Cronin and his girlfriend, on his behalf, completed function reports. See Transcript at 205-214, 226-233. The reports reflect, inter alia, that his typical day consists of sitting around the house. He is unable to go outside because he cannot be around other people.

Cronin testified during the administrative hearing about his mental impairment. See Transcript at 28-38. He cannot read or write but can add and subtract. He was fired from his last two jobs because he was unable to control his anger. He was not taking any medication for depression or anxiety but was hoping to obtain a prescription from a local medical clinic. People make him mad, and he believes they are out to get him.

The ALJ found at step two of the sequential evaluation process that Cronin has severe impairments in the form of a bipolar disorder and schizophrenia. At step three, the ALJ found that the impairments do not meet or equal Listings 12.03 or 12.04. The ALJ did not consider whether Cronin's impairments meet or equal Listing 12.05. The ALJ assessed Cronin's residual functional capacity and found that he is capable of performing "a full range of work at all exertional levels but with the following non-exertional limitation[]: [he] is limited to unskilled, entry level employment." See Transcript at 15. The ALJ incorporated no other mental limitations into the assessment. The ALJ found that Cronin has no past relevant work but could perform other work. The ALJ concluded that Cronin was not disabled for purposes of the Social Security Act since October 12, 2012, i.e., the day he filed his application for supplemental security income payments.

On the record now before the Court, it cannot be said that substantial evidence

on the record as a whole supports the ALJ's findings. Specifically, substantial evidence on the record as a whole does not support the assessment made of Cronin's residual functional capacity. The Court so finds for two reasons.

First, the ALJ found that Cronin has severe, mental impairments in the form of a bipolar disorder and schizophrenia. The ALJ failed, though, to incorporate any limitations from those impairments into the assessment of Cronin's residual functional capacity or failed to explain why such limitations were omitted.

Second, notwithstanding the foregoing, the Court assumes without deciding that it may be possible for a claimant's severe, mental impairments to have no impact on his residual functional capacity. The credible evidence, though, indicates that Cronin's mental impairments have some impact on his residual functional capacity. For instance, Cronin's IQ scores were within the mentally retarded range. The ALJ could and did discount the scores because they were inconsistent with a diagnosis of mental retardation. The scores, although discounted, and Caspall's opinions of Cronin's adaptive functioning nevertheless support the proposition that Cronin has some level of impaired intellectual functioning and has difficulty working around other people.

The ALJ has an obligation to fully and fairly develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully and fairly developed the record; the determination is made on a case-by-case basis. See Id.

The Court finds that the ALJ failed to fully develop the record with respect to

Cronin's mental impairments and the impact they have on his residual functional capacity. A remand is therefore necessary. Upon remand, the ALJ shall re-evaluate the evidence and determine the impact Cronin's mental impairments have on his residual functional capacity.

The Commissioner's decision is reversed, and this case is remanded. The remand in this case is a "sentence four" remand as that phrase is defined in 42 U.S.C. 405(g) and <u>Melkonyan v. Sullivan</u>, 501 U.S. 89 (1991). Judgment will be entered for Cronin.

IT IS SO ORDERED this 2nd day of June, 2016.

_____
UNITED STATES MAGISTRATE JUDGE